AO 91 (Rev. 11/11) Criminal Complaint  AUSA Thomas P. Peabody (312) 353-4307


FILED
9/4/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL D. STOVER

CASE NUMBER: 25CR540

**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about July 7, 2025, at Downers Grove, in the Northern District of Illinois, Eastern Division, and elsewhere, MICHAEL D. STOVER, the defendant, violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 875(c) | true threat in interstate commerce |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

/s/ Zachary Overby (MDW with permission)

ZACHARY OVERBY
Special Agent, Federal Bureau of Investigation (FBI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: September 4, 2025

*M. David Weisman*
*Judge's signature*

City and state: Chicago, Illinois

M. DAVID WEISMAN, Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

### AFFIDAVIT

I, Zachary Overby, being duly sworn, state as follows:

### INTRODUCTION AND BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been in this position since October 2024. I am responsible for investigations concerning threats to life, terrorism, and other violent offenses, and I am currently assigned to the Joint Terrorism Task Force in the FBI's Chicago Office. In my capacity, I have been involved in the execution of multiple arrest and search warrants.

2. This affidavit is submitted in support of: (1) a criminal complaint alleging that MICHAEL D. STOVER has violated 18 U.S.C. § 875(c) by making threats in interstate commerce to injure another person (the "**Subject Offense**"); (2) an application for a search warrant to search STOVER's cellular telephone, with number 708-543-1801 (the "**Subject Phone**"), as described in Attachment A, for evidence and instrumentalities of the **Subject Offense**, as described in Attachment B. Because this affidavit is being submitted for the limited purpose of securing a complaint against STOVER and a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe establish probable cause to believe that STOVER has committed the **Subject**

**Offense** and evidence and instrumentalities of the **Subject Offense** will be found during a search of the **Subject Phone**.

3. This affidavit is based on my personal knowledge, information provided to me by other law-enforcement agents, law-enforcement reports, interviews of witnesses, my experience and training, and the experience of other agents. Based on the facts set forth in this affidavit, there is probable cause to believe that MICHAEL D. STOVER has violated § 875(c), the **Subject Offense**, by transmitting threats in interstate commerce, and a search of the **Subject Phone** will reveal evidence and instrumentalities of that offense.

## PROBABLE CAUSE

4. In summary, between February and July 2025, MICHAEL D. STOVER, who uses the **Subject Phone**, has used social media accounts to make repeated threats against elected and law-enforcement officials, including with reference to and images of ammunition and firearms. In May 2025, the Downers Grove Police Department ("DGPD") and FBI deemed STOVER a Clear and Present Danger[1] and, following a domestic-disturbance call, seized five rifles, a shotgun, six handguns, and

---

[1] Based on my training and experience, under Illinois Law, 430 ILCS 65/8.1(d)(2) and 430 ILCS 66/105, law enforcement must report to the Illinois State Police, which oversees Illinois's Firearms Owner's Identification ("FOID") system, any person who (1) communicates a serious threat of physical violence against a reasonably identifiable victim or poses a clear and imminent risk of serious physical injury to himself, herself, or another person as determined by a physician, clinical psychologist, or qualified examiner; or (2) demonstrates threatening physical or verbal behavior, such as violent, suicidal, or assaultive threats, actions, or other behavior, as determined by a physician, clinical psychologist, qualified examiner, school administrator, or law enforcement official. Following the submission of such a report—called a Clear and Present Danger Report—Illinois State Police review to determine whether to revoke or deny the person's FOID.

ammunition—including five rifle rounds with the first names of well-known political figures written in marker. In July 2025, defendant continued to post threats, including, on July 7, 2025, posts stating, "we should be killing Ice [Immigration and Customs and Enforcement] agents on sight" and "I 700% am past that playtime shit. I mean kill the nazi rapist pigs to the absolute last one and kill their friends and families too…. Hurt the people and get hunted like a rat until your last desperate minutes, which will be slow if I can help it."

***Background on STOVER, Previous Threats, and Firearm Possession***

5.      STOVER is a 33-year-old male who resides with his spouse, Individual A, in Downers Grove, Illinois. According to law-enforcement databases, law-enforcement reports, and DGPD telephonic contact with STOVER, STOVER's telephone number is 708-543-1801 (the **Subject Phone**).

6.      In February 2025, the United States Secret Service ("USSS") Protective Intelligence Division reported that, on February 4, 2025, STOVER,[2] from his Facebook Account, "mike.stover.250", had posted a photograph of five rifle bullets—with the first names of five well-known U.S. political figures respectively written with marker on each bullet—placed on top of two hunting knives. STOVER posted the image in a Facebook group and in response to another user's post. In response, on or about February 11, 2025, USSS and DGPD interviewed STOVER at his home.

---

[2] Here, as well as in paragraphs 7, 12, and 13, my belief that the reports from other law-enforcement agencies pertained to STOVER is based on, among other things, the fact that STOVER admitted to being the user of the relevant social-media accounts ("mike.stover.250", here, and "scottishninja", below), as described below.

3

STOVER admitted to making the post, reported owning a FOID card and multiple weapons, stated that he had anxiety and post-traumatic stress disorder, which were being treated, expressed remorse for the post, and stated he would rub the names off of the bullets.

7. In May 2025, the FBI's National Threat Operations Center received a report from USSS regarding STOVER's continued posting of threatening messages—this time from a Bluesky account "@scottishninja." For example, STOVER posted the following:

a. *April 14, 2025*: "The us president just said he wants to purpose build concentration camps for his political enemies. Thats not a normal fucking thing to do!!! Its war right here and now against this attacker or we die in slavery. Put down your posters and selfie sticks and pick up a weapon!"

b. *April 14, 2025*: "Do not leave your house unarmed. Do not go anywhere with them, they are going to murder you if you do. It is time to shoot for your life if approached."

c. *April 16, 2025*: "Btw [by the way], I will not miss," with an image of two used shooting targets that had been fired at multiple times.

d. *May 3, 2025:* "If we are all criminals to him and he will without restraint, reservation, or afterthought, send armed men, now completely unidentified, deputized hate group members, into our homes, the laws in place regarding wartime self-defense now apply. Either they are arrested or theyll

4

massacre us. 2A now," with multiple images of STOVER with dark-colored face paint, an apparent scarf over his face, and/or in camouflage holding a rifle.

   e. *May 4, 2025*: "They came to my fucking house already. Theres a time for rhetoric, and a time for riflery…. ," with an image of STOVER holding a rifle upwards, again with dark-colored face paint, an apparent scarf over his face, and wearing a protective vest.

  8. On or about May 7, 2025, in light of these posts, DGPD and FBI entered a Clear and Present Danger request for STOVER with the Illinois State Police. The next day, on or about May 8, 2025, Illinois State Police reported that it had revoked STOVER's FOID card.

  9. The same day, on or about or about May 8, 2025, DGPD responded to a 911 domestic-disturbance call at STOVER's residence. According to DGPD, STOVER opened the door for officers, immediately shut it, and then opened the door again, with his hands in the air and an empty holster, a pocketknife, and a full magazine on his hip. DGPD then interviewed Individual A, STOVER's spouse, and STOVER.

   a. According to Individual A's report to DGPD, STOVER had been extremely irate, throwing items, and stated to Individual A "if you are like your father, I will kill you." Individual A told DGPD she did not want anything done regarding the threat. Individual A also told DGPD that STOVER took medication for mental-health issues but that it had recently run out, and that STOVER, after ranting about his fear for their safety, began throwing knives and guns at the door and stated that the government wanted STOVER and Individual A dead.

b. STOVER told DGPD that, due to his PTSD, he spirals when experiencing a trigger, and, according to DGPD, STOVER's interview dwelled on certain political figures, who he believed to be a threat to himself and Individual A. STOVER denied threatening Individual A. STOVER agreed to turn over his FOID card but he refused to turn in his firearms.

10. According to DGPD, due to the revoked FOID, and STOVER's possession of multiple firearms, including some classified by the state as assault weapons, DGPD arrested STOVER.[3] Individual A consented to the seizure of firearms and ammunition from the residence, and DGPD seized: (1) one Sig Sauer M400 rifle; (2) one Century Arms VSKA rifle; (3) one Smith & Wesson MP15-22 rifle; (4) one Anderson Manufacturing AM15 rifle; (5) one Mossberg 500C shotgun; (6) one French MAS 1949-56 rifle; (7) one Bersa Firestorm handgun; (8) two Smith & Wesson handguns; (9) one Smith & Wesson revolver; (10) one Rock Island Armory M1911 handgun; and (11) one Girsan Regard MC handgun. In addition DGPD seized an airgun, a four-pack of exploding targets, and the five rifle rounds with the names written in marker, described above. STOVER was not ultimately charged by the state and released.

11. On or about May 22, 2025, DGPD, a DGPD Crisis Intervention Sergeant, and FBI again interviewed STOVER at his home. STOVER admitted to posting

---

[3] STOVER gave a *Mirandized* interview, in which he expressed frustration about global affairs and the U.S. government. He stated that he spoke with Individual A about it, which led to the argument. STOVER stated he was in fear for his life and that he understood why DGPD had to take his guns and why his FOID had been revoked. STOVER confirmed each of the seized firearms (described below) were his.

6

threats toward ICE agents on his Bluesky account, "@scottishninja." STOVER reported receiving help for his mental-health issues, and he stated that he did not intend to kill anyone but he would in self-defense. STOVER stated that he did not have weapons but planned to retrieve them once his mental health improved. STOVER stated that he understood he could not make future threats, which could lead to additional visits from law enforcement and possible criminal charges.

***The July 7, 2025 Threats***

12. In July 2025, the Texas Department of Public Safety, Intelligence and Counterterrorism Division, also known as the Texas Fusion Center, reported that the Bluesky "@scottishninja" account—which, as explained above, is STOVER's—had posted additional messages between June and July 2025. For example:

 a. *July 21, 2025*: "When do we start tackling and imprisoning these fake cops and ice agents for their crimes? And where do I sign up to get to kick their asses?"

 b. *July 21, 2025, in a reply post*: "These are bare minimum items that must be physically enacted in no less than 6 months from now or motherfuckers are going to prison right along with the trump administration and these ice terrorists. Fuck the DNC and their posing followed by deliberate monkey wrenching. Time for consequences bitches."

 c. *July 7, 2025*: "Every single agent, officer, or whatever the fuck else they call themselves, LEGALLY signed their own death warrants by

participating in hostilities against the union and its citizens. It is legal to kill them for this, and we should be, with smiles on."

    d. *July 7, 2025*: "Yes, we should be killing Ice agents on sight, what the fuck else do you do to hostile armed forces kidnapping your people?"

  13. According to the report, STOVER continued on July 7, 2025, to post threatening messages in apparent reference to ICE agents. This included: "I 700% am past that playtime shit. I mean kill the nazi rapist pigs to the absolute last one and kill their friends and families too. No mercy for nazism in my motherfucking country. Hurt the people and get hunted like a rat until your last desperate minutes, which will be slow if I can help it." An image of this post is below.



STOVER additionally posted the following, again in reference to ICE agents[4]:

---

[4] According to a review of the "@scottishninja" account, it remains active as of about August 2025 but has not posted expressly threatening messages in recent weeks.



On July 7, 2025, STOVER further posted "This is an attack by a hostile army. ICE must be obliterated with mortar fire until a microscope is needed to tell the remains

apart," and "In a functioning country, the military would have been sent to KILL anyone doing what ICE is doing. Ill fucking sign right now to kill these racist terrorist thugs. Abolition is not enough, the goons themselves must be exterminated to the absolute last one. Masks off, photographs taken, then shoot em."[5]

**SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA**

14. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

    a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

---

[5] Based on my training and experience, all social-media posts, like those made by STOVER, are made in interstate or foreign commerce, because the Internet is a facility of interstate commerce and very often users send messages from states different from the ones where the social-media providers use data servers.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

15. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

16. In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain evidence or were used to carry out criminal activity.

17. Based on my training and experience, and my involvement in this matter, individuals, like STOVER, who commit the **Subject Offense** do so often

11

using electronic means, and individuals who are active social-media users, like STOVER is, are likely to have such social-media accounts on their cellphones. In addition, individuals who plan to carry out violent threats are likely to have evidence of the **Subject Offense** on their devices, including Internet searches, notes, and messages associated with the threats. Therefore, I submit that there is probable cause to search the **Subject Phone**, as it will likely contain evidence of the **Subject Offense**, including items related to threats made by STOVER, items reflecting his ownership of the above-described social-media accounts, items related to STOVER's use or possession of weapons, and items related to any attack planning or research.

18.     The warrant I am applying for would permit law enforcement to obtain from STOVER the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock the **Subject Phone**. I seek this authority based on the following:

a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

12

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are

13

considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

    e.  The passcode or password that would unlock the **Subject Phone** to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

    f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than a certain number of hours have elapsed since the device was last unlocked or (2) when, within a certain number of hours, the device has not been unlocked using a fingerprint and the passcode or password has not been entered. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g. Due to the foregoing, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of STOVER to the fingerprint scanner of the **Subject Phone**;[6] and (2) hold the **Subject Phone** in front of the face of STOVER and activate the facial recognition feature, for the purpose of attempting to unlock the **Subject Phone** in order to search its contents as authorized by this warrant.

### PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA AND AUTHORIZATION REQUEST

19. Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

20. The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

---

[6] Law enforcement will select the fingers to depress to the fingerprint scanner to avoid compelling the user of the device to disclose information about his or her knowledge of how to access the device.

15

    a. examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

    b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above;

    c. surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

    d. opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

  21. The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## CONCLUSION

22.     Based on the above, I submit there is probable cause to believe that STOVER has committed the **Subject Offense**, namely, making threats in interstate commerce, and that evidence and instrumentalities of the **Subject Offense**, described more fully in Attachment B, are likely to be found in the **Subject Phone**.

FURTHER AFFIANT SAYETH NOT.

/s/ Zachary Overby (MDW with permission)

ZACHARY OVERBY
Special Agent, Federal Bureau of Investigation

SWORN TO AND AFFIRMED by telephone this 4th day of September, 2025.

*M. David Weisman*

Honorable M. DAVID WEISMAN
United States Magistrate Judge